**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 20-cr-108-CJW |
| Plaintiff, | |
| vs. | |
| | **REPORT AND RECOMMENDATION** |
| MATTHEW SHAWN VICTOR | **ON DEFENDANT'S MOTION TO** |
| BRIDGES, | **SUPPRESS** |
| a/k/a Matthew Bell, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

**Page**

I.     *INTRODUCTION*..........................................................................2

II.     *FINDINGS OF FACT*................................................................3

     A.     *Preface*.................................................................................3

     B.     *Background of Sergeant Wegg and the Iowa Falls Police Department*......................................................................4

     C.     *The Events of January 2020*.................................................4

     D.     *The Events of February 15-16, 2020*.....................................7

     E.     *Subsequent Investigation*....................................................10

III.     *DISCUSSION*......................................................................14

     A.     *Was the seizure of the Kia supported by probable cause?*.................14

         1.     *The Parties' Arguments*................................................14

1

  2.  *Relevant Law* ...............................................................**15**

  3.  *Analysis* ...................................................................**16**

B.  *If the seizure was not supported by probable cause, does the good-faith exception apply to the eventual search?* .......................................**20**

C.  *Is evidence found in the search of the Kia fruit of the poisonous tree?* ......................................................................**27**

IV.  **CONCLUSION** ...............................................................**30**

## I.    INTRODUCTION

On December 15, 2020, the Grand Jury charged Defendant with one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. Section 846; one count of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(A); one count of Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(B); and three counts of Possession of a Firearm by a Felon in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2).  (Doc. 2.)  The matter before the Court is Defendant's Motion to Suppress.  (Doc. 25.)  Defendant seeks suppression of evidence seized during the February 27, 2020 search of his vehicle.  (Doc. 26.)  The Government filed a timely resistance to the motion.  (Doc. 29.)  Defendant timely filed a reply.  (Doc. 30.)  The Honorable Charles J. Williams, United States District Court Judge, referred the motion to me for a Report and Recommendation.

I held a hearing on February 24, 2021. At the hearing, Defendant's Exhibits A through F were admitted without objection:

A. A list of items returned pursuant to the search warrant dated February 27, 2020;

B. An Iowa Falls Police Department vehicle impound record;

C. An investigative report by Investigator Tina M. Debban;

D. A partial transcript of the July 30, 2020 deposition of Sergeant Daniel Wegg of the Iowa Falls Police Department;

E. The search warrant application for Defendant's vehicle; and

F. A map of the relevant area.

Government Exhibit 1 was also admitted without objection: The entire transcript of the July 30, 2020 deposition of Sergeant Wegg.

The Government called one witness, Sergeant Daniel Wegg.

## II.    FINDINGS OF FACT

### A.    Preface

The single issue raised by Defendant is the warrantless seizure of the purple Kia Optima he was driving[1] on February 16, 2020.  The parties disagree regarding whether that seizure was supported by probable cause when Sergeant Wegg seized it.   The Government contends that, even if law enforcement lacked probable cause for the seizure, evidence obtained from the vehicle pursuant to a later search warrant should not be suppressed because of the good-faith exception under *United States v. Leon*, 468 U.S. 897, 922 (1984).  Thus, the legal issues presented are at least straightforward.

The facts are more complicated.  The seizure followed a February 15, 2020 home invasion or burglary by Defendant and others.   However, the facts for the Court to consider stretch back to January 3, 2020 when a police encounter resulted in the impoundment of a black Hyundai Elantra owned by Defendant's girlfriend, Nyjaya Foster.   Sergeant Wegg testified regarding both events.   In addition, Sergeant Wegg's

---

[1] The Kia Optima was titled in the name of Defendant's father.  There is no issue regarding Defendant's interest in the vehicle.  For convenience, I will refer to it as "Defendant's vehicle" or "the Kia."

Case 1:20-cr-00108-CJW-MAR    Document 36    Filed 04/01/21    Page 3 of 30

investigation continued after the February 16, 2020 seizure of Defendant's vehicle. Sergeant Wegg obtained a warrant to search Defendant's vehicle on February 27, 2020. His affidavit in support of the warrant application thus contains information that came to the attention of law enforcement after Defendant's vehicle was seized on February 16. This affidavit is in evidence along with Sergeant Wegg's testimony from the February 24, 2021 hearing, and the transcript of a July 30, 2020 deposition he gave in an Iowa District Court criminal prosecution of Defendant. One challenge presented to the Court is teasing out from these sources what law enforcement (principally in the person of Sergeant Wegg) knew at the time of the seizure.

**B.    *Background of Sergeant Wegg and the Iowa Falls Police Department***

Sergeant Wegg is a graduate of the Iowa Law Enforcement Academy and has a master's degree in criminal justice. He has been an officer with the Iowa Falls Police Department ("IFPD") since 2018. Prior to that, he had been a deputy sheriff with the Hardin County Sheriff's Office for two years. The IFPD is composed of ten officers, including the police chief and the captain. I will first describe the incidents known to Sergeant Wegg at the time of the seizure from his own investigation or from his fellow officers.

**C.    *The Events of January 2020***

Although Sergeant Wegg was not involved in the events of January 3, 2020, he had detailed knowledge of the events and the investigation prior to the seizure of Defendant's vehicle more than a month later.   On the morning of January 3, 2020, the IFPD received a report of "suspicious males" walking through a yard near the Agri-Pro warehouse in Iowa Falls. Sergeant Ehrhardt and Officer Krieger responded to the scene. A male subject later identified as Steven Riggs was seen exiting a black Hyundai Elantra and fleeing on foot. This black Hyundai Elantra was later determined to belong to Ms. Foster. The Hyundai was found running, with the driver's and rear driver's side doors

open.  An undetermined number of people fled the scene in another vehicle that was never identified.  Sergeant Ehrhardt chased Mr. Riggs and Officer Krieger pursued the other vehicle.

When Mr. Riggs stopped and turned, Sergeant Ehrhardt saw a rifle in his hands. Sergeant Ehrhardt then tased Mr. Riggs and apprehended him.  When Sergeant Ehrhardt reported the presence of a gun, Officer Krieger suspended his pursuit of the vehicle and returned to the scene.  In addition to the rifle on Mr. Riggs's person, law enforcement found two additional rifles "at a residence just sitting there."  While all of the rifles were of the same caliber, no explanation was offered at the hearing to connect them to Mr. Riggs, Ms. Foster's vehicle, or the incident to which officers were responding.  Sergeant Wegg's affidavit in support of the search warrant for Defendant's vehicle states that the two additional rifles were recovered "from the area near" the Hyundai and that all of the rifles were AR-15 style .22 caliber rifles.  (Def. Ex. E at 8-9 ¶ 12.)

Sergeant Ehrhardt interviewed Mr. Riggs.  Mr. Riggs did not disclose the name of the person from whom he received the rifle; however, he stated he had obtained it from a Black or Hispanic male with dark, curly hair.  Sergeant Wegg testified this description generally matches Defendant.[2]

Sergeant Wegg's affidavit further states that law enforcement determined the vehicle was registered to Ms. Foster.  (*Id*. at 9 ¶ 15.)  Ms. Foster's vehicle was seized and taken to the IFPD.  Pursuant to a warrant issued the following day, Ms. Foster's vehicle was searched.  "[A] large amount of white crystal substance, believed to be methamphetamine was seized and sent to the DCI lab for testing."  (*Id*. ¶ 13.)  The suspected methamphetamine was found in a black backpack that also contained

---

[2] Defendant made an interesting point on cross-examination regarding this issue.  Defendant pointed out that the term "Hispanic" merely denotes someone who speaks Spanish or is from a Spanish-speaking country.  The term appears to be in wide use among law enforcement officers for purposes of physical description.

approximately $6,000[3] in cash.  At the hearing, Sergeant Wegg testified law enforcement also found rounds of rifle ammunition, magazine clips, a collapsible baton, a police scanner, a taser, and drug paraphernalia. As Sergeant Ehrhardt was searching the vehicle, he learned that Ms. Foster had reported her vehicle stolen at the Charles City Police Department.[4]

Ms. Foster and Defendant each made efforts to have Ms. Foster's vehicle or the money released.  On February 5, 2020, Ms. Foster called and later came to the IFPD claiming the large sum of money found in the Hyundai.  Sergeant Wegg's affidavit notes that the money was in the same black backpack where the suspected methamphetamine was located.  Ms. Foster did not mention the suspected methamphetamine or the firearms and did not report the firearms having been stolen.  (*Id.* ¶ 15.)  On January 10, 2020, Defendant appeared at the IFPD to have the vehicle or the money released.  Sergeant Wegg did not know whether Defendant was attempting to have the money returned to Defendant or Ms. Foster.  On one occasion, officers were dispatched to the impound lot when Defendant became upset and was reported "as not acting pleasant" because the vehicle was not being released. Defendant was not cited or arrested for any offense at that time.

---

[3] At the hearing, Sergeant Wegg identified the amount in question as $5,000 but his affidavit, which was drafted closer to the time of the incident, indicates the amount was $6,000. (Def. Ex. E at 9 ¶ 13.) Regardless, Sergeant Wegg was attempting to use only approximate figures.  He testified that $4,000 was found in a cash box located in the backpack with the methamphetamine and the remainder was scattered throughout the bag or backpack.

[4] Sergeant Wegg testified, "[I]t was then later reported I believe it was about the next morning by Ms. Foster and the vehicle was stolen."  In his search warrant application for the Kia, Sergeant Wegg stated that Sergeant Ehrhardt "was notified the vehicle was reported as stolen by Foster on 01/03/2020 at 2118."  (Def. Ex. E at 9 ¶ 13.)  The vehicle was thus reported stolen after it was seized by the IFPD but the IFPD was not notified about this report until January 4. (*Id.*)

6

On about January 10, 2020, Sergeant Wegg stopped Defendant who was driving a Chrysler Pacifica for a taillight violation. Defendant was also known by law enforcement to drive the Kia.

## D.    The Events of February 15-16, 2020

At 9:18 p.m. on February 15, 2020, Sergeant Wegg was one of two officers dispatched to the residence of Martika Stewart and Will Smith ("the Stewart residence") at 1210 Ellis Avenue in Iowa Falls in response to a report of a burglary in progress involving a firearm. Ms. Stewart and Mr. Smith were the only persons present when Sergeant Wegg arrived approximately two minutes later. There were no signs of forced entry. However, Sergeant Wegg seized a black revolver that was found at the scene. (Def. Ex. E at 9 ¶ 16.)

Mr. Smith reported that Defendant, identified by his nickname Mocha,[5] and two women broke into the residence and confronted him. Although the *casus belli* was better explained later in the investigation, on the night of the incident, Mr. Smith stated the struggle began after Defendant demanded his "shit" from Mr. Smith. Mr. Smith denied possession or knowledge of whatever Defendant was referring to. Mr. Smith had a mark on his forearm where Defendant had struck him with a collapsible baton.[6] Defendant called for a gun. When one of the women produced a revolver, Mr. Smith wrestled it from her and fired two shots. Defendant and the two women then fled. There is no evidence that any of the assailants took anything from the residence. No one provided law enforcement information regarding how Defendant arrived at the residence or described the direction he fled.

---

[5] Defendant was later identified by Mr. Smith from a photograph Sergeant Wegg showed him.
[6] It appears that "collapsible baton" and "police baton" are terms for the same weapon. Sergeant Wegg also uses the term "police Asp weapons" to refer to the police batons Defendant and Ms. Foster had with them on that night. (Def. Ex. E at 10, 12 ¶¶ 17, 25.)

At approximately 9:50 p.m., Officer Krieger was patrolling in the 600 block of Hickory Street in Iowa Falls. Defendant's Exhibit F shows the site of the burglary south and west of the Iowa River that winds through the city of Iowa Falls. Defense Exhibit F also shows various routes north and east across the river from the Stewart residence to the 600 block of Hickory Street. Each of the routes is approximately one mile. Sergeant Wegg estimated the distance at a mile-and-a-half to two miles. On Hickory Street, Officer Krieger located the Kia registered to Defendant's father but known to be operated by Defendant. Sergeant Wegg went to look at the Kia and noticed there was no frost on its windows. This led Sergeant Wegg to conclude the Kia had been very recently operated. This conclusion was founded solely on his experience living through winters in Iowa and Pennsylvania where he grew up. Sergeant Wegg has no specialized training in this area. He did not put his hand on the hood or exhaust pipe of the vehicle to check for heat; nor did he inspect other vehicles in the area for frost on their windows. Law enforcement unsuccessfully attempted to find Defendant in nearby residences.

On February 16, 2020, Sergeant Wegg drafted arrest warrant applications for Defendant and Ms. Foster for the burglary at the Stewart residence. On the same day, law enforcement began looking for Defendant and observed Defendant's Kia in the area near where Defendant's mother lived near the 600 block of Hickory Street.[7] Although the warrant applications had been submitted, no warrant had been issued when Sergeant Wegg encountered Defendant that same day while Defendant was driving west on Ellis

---

[7] It is not altogether clear when law enforcement learned where Defendant's mother resided. At the hearing, Sergeant Wegg testified that it was "later discovered" the Defendant's mother is known to reside near the area of the 600 Hickory Street. In his deposition, Sergeant Wegg testified that on February 16, law enforcement "went to look by his mother's house, which – I'm trying to remember what street that was. We did locate his vehicle down the street, parked on – I believe it was on Iowa." (Gov. Ex. 1 at 7 (24).)

8

Avenue near the Stewart residence.[8]  Sergeant Wegg had been traveling east on Ellis Avenue.  He turned around to follow Defendant and contacted the Hardin County Attorney for advice about effecting a warrantless arrest.  While following Defendant, Sergeant Wegg saw Ms. Foster walking near the Stewart residence where the burglary had occurred.  His affidavit indicates that while following Defendant, Sergeant Wegg saw Ms. Foster walking near the location of the burglary, specifically by Moorhead Avenue which, according to a Google map, is just west of the Stewart residence.  Ms. Foster was ultimately arrested on, coincidentally, Foster Boulevard which is east of the site of the burglary and in the opposite direction of where Sergeant Wegg saw her walking.

Sergeant Wegg activated his red and blue lights.  Defendant pulled into the parking area of an apartment complex and parked legally.  Sergeant Wegg first pulled out a passenger from the back seat who was later identified as Adam Schmitz.  Sergeant Wegg then removed Defendant from the vehicle at gunpoint.  When another officer arrived, Defendant was handcuffed and placed in Sergeant Wegg's patrol car.  Sergeant Wegg's affidavit states, "I then placed Bridges under arrest with the belief that probable cause

---

[8] The evidence regarding the direction of travel is somewhat confused at this point.  On cross-examination, Sergeant Wegg conceded that Defendant could have been traveling west on Ellis Avenue on his way to Interstate 35 and ultimately to Defendant's residence in Mason City.  However, the IFPD vehicle impound record indicates the location of impoundment was at South River Street and Bliss Boulevard which, according to a Google map, is east of the Stewart residence.  Sergeant Wegg's affidavit states that he observed Defendant drive into a driveway "on South River just south of the River St. Bridge," which is also east of the Stewart residence according to a Google map.  (Def. Ex. E at 11.)  Sergeant Wegg testified at the hearing that "Ms. Foster continued to walk in the same direction in which [he was] following Mr. Bridges and ultimately arrested him."  There may have been one or more unexplained turns while Sergeant Wegg followed Defendant and contacted the county attorney.  Alternatively, my understanding of Iowa Falls geography may be faulty.  In any event, I do not find the lack of clarity on this point material.

9

existed to charge Bridges with crimes related to the home invasion that occurred on 02/15/20." (Def. Ex. E at 11 ¶ 22.)

Sergeant Wegg could see nothing of evidentiary value in plain view in the vehicle. At that time, law enforcement seized the Kia and had it towed to the IFPD impound garage. At the hearing, Sergeant Wegg explained the decision to seize the vehicle as follows: "Because it was believed that, due to the prior incident that occurred in January and the incident that occurred in the burglary on February 15th, that there was additional firearms and possible drugs inside the vehicle and items related to the burglary."

### E.    *Subsequent Investigation*

I conclude that the information recounted above would have been known to law enforcement when Defendant's vehicle was seized on February 16, 2020 and, therefore, could form the basis for finding probable cause existed to seize Defendant's vehicle. Law enforcement undertook additional investigation after the seizure. Information discovered during this subsequent investigation made its way into Sergeant Wegg's affidavit in support of the search warrant. While this later investigation could not have informed the decision to seize the Defendant's vehicle, it may nevertheless be relevant to the *Leon* and fruit of the poisonous tree analyses.

Sergeant Wegg testified that he wanted to be "safe" and obtain a search warrant prior to searching the vehicle. He also testified that although he had written "basic" warrant applications previously, he had not drafted one as long or complex as the one in the instant case. Sergeant Wegg testified that while he commenced drafting the warrant application on February 17, he did not present the warrant to be signed until February 27, 2020. Part of this delay was attributable to interruptions in the drafting process as he responded to other incidents and worked on other cases because of the small size of the IFPD. In addition, Sergeant Wegg was continuing to investigate this case while simultaneously working on the warrant, as discussed below.

10

After being transported from the scene of the arrest to the Hardin County Jail, Defendant made a post-*Miranda* admission that he had been invited to the Stewart residence by Adam Schmitz. (Def. Ex. E at 11 ¶ 24.) Mr. Schmitz was a passenger in Defendant's Kia when he was arrested; however, law enforcement did not learn of his presence at the Stewart residence earlier on the evening of February 15 until well after the vehicle was seized. (*Id.* at 13 ¶ 28.) Defendant denied bringing a handgun to the Stewart residence, but did not know if Ms. Foster, his girlfriend, had brought one. (*Id.* at 11-12 ¶ 24.) Defendant also stated that Mr. Riggs, who had been tased on January 3, was at the Stewart residence on February 15, which was information law enforcement had not previously known. (*Id.*)

While the application for a search warrant was being prepared, Defendant's father came to the police station to request return of the Kia but was denied because it was being held as evidence.

On February 20, 2020, Sergeant Wegg and Special Agent Bryant Strouse of the Iowa Division of Narcotics Enforcement interviewed Steven Riggs, the person who had been apprehended with a rifle on January 3. (*Id.* at 12 ¶ 25.) Mr. Riggs identified Defendant and Ms. Foster as two of the people who assaulted Mr. Smith during the burglary on February 15. (*Id.*) Defendant had arrived at the residence while Mr. Smith and Ms. Stewart were away. (*Id.*) When Mr. Riggs saw Mr. Smith and Ms. Stewart returning, he let Defendant, Ms. Foster, and an unidentified woman into the residence's bathroom thinking that would avoid a fight. (*Id.*) Defendant, Ms. Foster, and the other woman eventually confronted Mr. Stewart in the living room. (*Id.*) Defendant and Ms. Foster had police batons, and the other woman had a taser. (*Id.*) A taser was later recovered outside the residence. (*Id.*) Mr. Riggs saw Defendant hit Mr. Smith with the baton. (*Id.*) The unidentified woman attempted to hand a firearm to Defendant, but Mr.

Smith somehow intercepted it and fired it. (*Id.*) This was the revolver officers recovered from the scene on February 15. Defendant and the two other assailants then fled. (*Id.*)

Mr. Riggs also discussed with law enforcement the events of January 2 and 3. (*Id.* ¶ 26.) On the night of January 2, Mr. Riggs met with Defendant, Ms. Foster, and another person named Bridges, possibly Defendant's brother. (*Id.*) The group drove to a pawnshop in Marshalltown, Iowa and selected .22 caliber AR-15 style rifles[9] that were purchased by Ms. Foster. (*Id.*) The group then drove to Defendant's residence in Mason City, Iowa where Mr. Riggs instructed them in the use of the rifles. (*Id.*) They next drove to a Walmart to purchase ammunition and finally to a trailer park in Hampton, Iowa. (*Id.* ¶¶ 26-27.) Defendant went into a trailer carrying a black backpack and returned to Ms. Foster's Hyundai Elantra carrying the same backpack. (*Id.* at 12-13 ¶ 27.) Mr. Riggs did not know what was in the backpack other than the ammunition they had purchased, which they had put into the backpack after purchasing it at Walmart. (*Id.* at 13 ¶ 27.) The group then returned to Iowa Falls. (*Id.*)

On the morning of January 3, Mr. Riggs waited in Ms. Foster's Hyundai while Defendant, Ms. Foster, and the unidentified Bridges met with a person unknown to Mr. Riggs. (*Id.*) During this meeting, Defendant had all three rifles in his possession. (*Id.*) Mr. Riggs reported that when law enforcement arrived on the scene where he was arrested on January 3, Defendant, Ms. Foster, and the unidentified Bridges fled. (*Id.*)

Law enforcement also conducted additional interviews with Ms. Stewart and Mr. Smith, residents of the Stewart residence where the burglary had occurred. Mr. Smith provided information regarding Defendant's involvement in methamphetamine trafficking. (*Id.* at 14 ¶¶ 30-33.) Defendant and Mr. Smith had previously traveled to Ottumwa, Iowa in Defendant's Kia where Defendant purchased a large quantity of

---

[9] Sergeant Wegg's affidavit does not indicate how many rifles were purchased, but later refers to "all three rifles." (*Id.* at ¶¶ 26-27.)

methamphetamine. (*Id.* ¶ 30.) They returned to Iowa Falls where, Mr. Smith reported, Defendant is the main methamphetamine distributor. (*Id.*) Mr. Smith further reported that the confrontation on February 15 resulted from a dispute over payment for the trip to Ottumwa or missing methamphetamine. (*Id.* ¶ 32.) Mr. Smith also told Sergeant Wegg that Defendant told him that a couple nights before the February 15 burglary, Defendant had gone back to Ottumwa and gotten "double the amount of methamphetamine" he had obtained on the trip with Mr. Smith. (*Id.*) Mr. Smith stated he knew Defendant possessed a .45 caliber firearm and another AR-15 rifle somewhere, "possibly in Bridges' vehicle." (*Id.* ¶ 33.)

Mr. Smith was able to identify the third assailant in the February 15 burglary as Kathleen Dolan. (*Id.*) The .38 caliber revolver fired during the burglary was traced to her brother in Marshalltown, Iowa. (*Id.* at 15 ¶ 34.)

Finally, Sergeant Wegg reviewed phone calls made by Defendant from the Hardin County Jail during which Defendant told others that the police could not search his vehicle and he requested they attempt to retrieve the vehicle from the police. (*Id.* ¶ 35.)

On February 27, 2020, after obtaining a warrant, Sergeant Wegg searched the Kia and recovered more than five grams of ice methamphetamine, two firearms, cellular phones, and the other items that Defendant now seeks to have suppressed. (Def. Ex. A.)

On March 2, 2020, the Kia was released to Defendant's father Garland Bridges at no cost. (Def. Ex. B.) For unexplained reasons, the Chief of Police waived the approximately $200 towing and storage fee. (*Id.* ($100 for towing and storage costs of $25 + $5 per day for 14 days).) Similar fees were not waived with respect to Ms. Foster's vehicle.[10] Additional facts will be discussed as necessary.

---

[10] Defendant raised this point at the hearing on cross-examination of Sergeant Wegg but never attempted to explain the significance of the different treatment of the Foster vehicle and the Bridges vehicle. The implication Defendant perhaps wants the Court to draw is that the IFPD tacitly acknowledged something irregular about the seizure of the Bridges vehicle by waiving the

## III. DISCUSSION

### A. Was the seizure of the Kia supported by probable cause?

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless seizures are *per se* unreasonable unless one of the carefully drawn exceptions applies. *See Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993); *United States v. Lewis*, 864 F.3d 937, 943 (8th Cir. 2017). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *United States v. Demoss*, 279 F.3d 632, 635 (8th Cir. 2002).

### 1. The Parties' Arguments

Defendant focuses on what he believes is insufficient evidence to tie the Kia to the burglary at the Stewart residence on February 15. The Government responds that the automobile exception applies to this situation because there was probable cause to believe the Kia contained evidence of a crime and therefore, a warrantless seizure of the Kia was lawful.

Defendant's argument is limited. He merely asserts that the February 16 seizure was not supported by probable cause. Defendant does not assert that the ten-day delay in effecting the search violated his Fourth Amendment rights. *See, e.g., United States v. Fife*, 356 F. Supp. 3d 790, 800 (N.D. Iowa 2019) (granting motion to suppress based on delay between seizure and search where the "[g]overnment proffered no reason for the delay in obtaining a warrant" and the officer responsible "performed no additional work on the case for months, simply because he did not believe the matter was time sensitive.")

---

fees. The IFPD has no written policy regarding impoundment. I find the record on this point too insubstantial to draw any such inference.

It should also be noted Defendant does not argue that the warrant application was unsupported by probable cause.

### 2. Relevant Law

This Court has recently addressed the automobile exception:

> The automobile exception to the warrant requirement has a long provenance in our caselaw. The exception was originally justified by the "practical challenges of obtaining a warrant for a vehicle that could be 'quickly moved' out of the jurisdiction." *United States v. Blaylock*, 535 F.3d 922, 926 (8th Cir. 2008) (quoting *Carroll v. United States*, 267 U.S. 132, 153 (1925)). "This is strikingly true where the automobile's owner is alerted to police intentions and, as a consequence, the motivation to remove the evidence from official grasp is heightened." *Cardwell v. Lewis*, 417 U.S. 583, 590 (1974). The "ready mobility" of an automobile which justifies dispensing with the warrant requirement refers not merely to the immediacy with which a vehicle may be moved, but to the possibility that it could be moved at all—what the Court calls "inherent mobility." Accordingly, a vehicle may be searched without the need of a warrant even if the owner is in custody, *United States v. Castaneda*, 438 F.3d 891, 893–94 (9th Cir. 2006), if the vehicle is secured in a police impound lot, *Michigan v. Thomas*, 458 U.S. 259, 261 (1982), or if the vehicle is stuck in a ditch. *United States v. Maggard*, No. 00-1146, 2000 WL 680394, at *1 (8th Cir. May 26, 2000).

*U.S. v. Maccani*, 20-CR-90-CJW-MAR, 2021 WL 943109, at *16 (N.D. Iowa Mar. 12, 2021). Thus, the automobile exception to the warrant requirement permits the warrantless seizure of a vehicle by officers possessing probable cause to do so. *United States v. Soderman*, 983 F.3d 369, 375 (8th Cir. 2020) (citing *Chambers v. Maroney*, 399 U.S. 42, 50–51 (1970)).

Likewise, when probable cause exists to search a vehicle, "the opportunity to search is fleeting since a car is readily movable," therefore, "if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary

to obtain a warrant for the search." *Chambers*, 399 U.S. at 50–51; *United States v. Cook*, No. 13-CR-2036-LRR, 2014 WL 789196, at *4 (N.D. Iowa Feb. 26, 2014) (quoting *Chambers*, 399 U.S. at 51). If law enforcement has probable cause to believe the car may contain contraband or evidence of a crime, the vehicle may be seized without a warrant. *Cook*, 2014 WL 789196, at *4.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003) (quoting *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)). Because "[p]robable cause is a practical and common-sensical standard," officers may draw inferences from the evidence based on their own experiences as to whether probable cause exists. *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017) (internal quotation marks and citations omitted). "Probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Donnelly,* 475 F.3d 946, 954 (8th Cir. 2007) (quoting *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001)) (internal ellipses omitted). The Government bears the burden of establishing that the automobile exception applies to the warrantless seizure of the Kia. *See United States v. Kennedy,* 427 F.3d 1136, 1140 (8th Cir. 2005) (noting the government bears the burden of establishing an exception to the warrant requirement).

### 3. *Analysis*

Defendant points out that no one saw his vehicle near the scene of the February 15 burglary and that it was found approximately one mile away. Defendant also notes the absence of evidence of forced entry and the fact that no property was reported stolen; the implication being that law enforcement was unlikely to find burglary tools or stolen property in the Kia. Defendant further notes that the revolver the assailants attempted to

use against Mr. Smith was left at the residence and thus could not have been recovered from the Kia. While these points are well taken, Defendant's argument attempts to unduly constrain the nature of the ongoing investigation.

I note that the Iowa Code defines burglary as follows:

> Any person, having the intent to commit a felony, assault or theft therein, who, having no right, license or privilege to do so, enters an occupied structure, such occupied structure not being open to the public, or who remains therein after it is closed to the public or after the person's right, license or privilege to be there has expired, or any person having such intent who breaks an occupied structure, commits burglary.

Iowa Code § 713.1. The gravamen of a burglary charge is not forcing entry or stealing property, although such actions may be part of the criminal conduct. Rather, the essence of a burglary charge is entering an occupied structure without the right to do so and with the intent to commit a felony, assault, or a theft. At the time the Kia was seized, Sergeant Wegg had no reason to believe Defendant was present at the Stewart residence with permission when he was alleged to have assaulted Mr. Smith. Possible evidence associated with a burglary, under these circumstances, extends beyond burglary tools and stolen property. Defendant and the other assailants together had at least a revolver, a taser, and two police batons. A vehicle, if tied to the burglary temporally, geographically, and circumstantially, as discussed below, could reasonably be expected to contain additional weapons or accessories for them such as holsters, ammunition, and taser chargers. Also, because there had been a struggle at the Stewart residence, the vehicle might contain blood or other forensic evidence if it was determined that an assailant had been injured.[11]

---

[11] When arrested, Defendant had a mark on his forehead, but did not say if he was injured in a struggle. (Wegg Hr'g Test.) Sergeant Wegg later determined that Defendant had been hit by a bullet ricochet during the struggle and had to be bandaged. (Gov. Ex. 1 at 16 (60).)

Sergeant Wegg's investigation after the seizure provided information that focused his warrant application on drug trafficking. However, by the time he seized the vehicle on February 16, he already had reason to believe Defendant could be involved in drug trafficking. Defendant's girlfriend's Hyundai had been seized containing a large amount of methamphetamine and a large sum of cash. The Hyundai was also closely associated with three assault rifles. Moreover, the Hyundai contained a police baton and a taser; i.e., weapons also associated with the February 15 incident. While Defendant was not identified at the scene of the January 3 encounter, there were unidentified individuals who had fled. In addition, Mr. Riggs, who was arrested in possession of a rifle, gave a description of the person who provided him the weapon that was at least consistent with Defendant's appearance. Moreover, Defendant's persistent and "unpleasant" actions as he sought to recover the large sum of cash that had been located in the same backpack as the methamphetamine and ammunition, tend to point toward his involvement in drug trafficking. Thus, Sergeant Wegg's explanation of the criminal activity he was investigating at the time he seized Defendant's Kia was broader than the incident on February 15, "[b]ecause it was believed that, due to the prior incident that occurred in January and the incident that occurred in the burglary on February 15, that there was additional firearms and possible drugs inside the vehicle and items related to the burglary." (Wegg Hr'g Test.)

Defendant's argument can be read as an objection to the lack of nexus between the Kia and the alleged criminal activity. The Kia had not been seen at the location of the January incident or near the burglary in February. The evidence regarding the absence of frost on the Kia's windows on February 15 relies more on common sense and casual experience than on science and rigorous testing. We know nothing of the temperature, humidity, or dew point on the night of the incident, other than that it was likely a typically cold, Northern Iowa night in the middle of February. Nevertheless, I find the lack of

frost on the windows tends to support the existence of probable cause to seize the Kia. *See Kennedy*, 427 F.3d at 1141 (probable cause determination is based on a common-sense view of the totality of the circumstances). A police officer who grew up in Pennsylvania and worked in law enforcement in Iowa would have had the opportunity to observe vehicle windows become frosted. I find Sergeant Wegg's testimony to be credible on this issue and the other subjects about which he testified.

By itself, the unfrosted Kia might not be sufficient to find a nexus between the alleged criminal activity and the vehicle; however, it is not the only evidence of Defendant's use of the Kia. The record does not show when Ms. Foster's Hyundai was released to her. It seems unlikely it was in the possession of the IFPD as late as February 15, 2020. In any event, her vehicle was not seen near the Stewart residence. Rather, Ms. Foster was seen on foot near the residence the night of February 15 (Def. Ex. E at 10 ¶ 19) and the day of February 16. It is not unreasonable to assume that people with access to motor vehicle transportation will tend to avail themselves of it in Iowa in the winter. Moreover, there is reason to believe Ms. Foster had been riding in Defendant's Kia, at least on February 16. It is somewhat odd that when Defendant was pulled over by Sergeant Wegg his passenger was riding alone in the back seat of the Kia. That would be, in my experience, an atypical way for two people to initially situate themselves in a motor vehicle. However, two people are more likely to remain in those positions after having dropped off one or more passengers. While Sergeant Wegg did not observe Ms. Foster in the vehicle, it is not unreasonable to suspect Ms. Foster had recently been in the Kia with her boyfriend when she was seen on February 16. Thus, the possibility that two suspects from the burglary, Defendant and Ms. Foster, had recently been in the Kia increased the chances that evidence would be present when it was seized.

In addition, Sergeant Wegg knew Defendant resided in Mason City. Mason City is more than sixty miles away by the route Defendant would have been taking if he was

traveling there as suggested by Defendant's counsel.  The fact that Defendant did not live within easy walking distance of the Stewart residence makes it more likely a vehicle was involved in his travel to and from the residence on the night of the burglary.  The fact that Defendant and perhaps Ms. Foster were driving near the same address the following day supports the existence of probable cause to believe the vehicle contained evidence. Thus, I find that officers had probable cause to believe the Kia would contain evidence related to the February 15 burglary.  I cannot conclude separately that there was probable cause to believe the vehicle would contain evidence of drug trafficking or contraband at the time it was seized.  Nevertheless, the events of January 3 that were known to Sergeant Wegg from other officers, add to the "laminated total" of the information known by law enforcement and contributes to the probable cause for the seizure.  *See United States v. Conner*, 948 F. Supp. 821, 842 (N.D. Iowa 1996) (citing *United States v. Kye Soo Lee*, 962 F.2d 430, 436 (5th Cir. 1992)), *aff'd*, 127 F.3d 663 (8th Cir. 1997).  Thus, a warrantless seizure of the Kia pursuant to the automobile exception was justified based on probable cause and the mobility of the Kia.  *See Carney*, 471 U.S. at 390–91 (noting that ". . . our cases have consistently recognized ready mobility as one of the principal bases of the automobile exception") (citations omitted).

**B.**     ***If the seizure was not supported by probable cause, does the good-faith exception apply to the eventual search?***

I have determined that probable cause existed to seize the Kia on February 16, 2020.  The Government argues that even if probable cause did not exist to seize the Kia, the good-faith exception applies to the search warrant obtained on February 27, 2020. Defendant, however "denies that the *Leon* good faith exception applies here.  The Defendant is challenging the warrantless seizure of the vehicle on February 16, 2020; as it was a seizure without judicial approval, [Defendant asserts that] the reasoning behind *Leon* does not apply and neither does its good-faith exception."  (Doc. 30 at 1.)

20

Defendant argues that *Leon* applies to warrants that have first been reviewed by a judge or magistrate and therefore have at least some indicia of validity, making officers' reliance on them reasonable. *See United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.") (quoting *Leon*, 468 U.S. at 921).

Reviewing courts should not suppress evidence seized pursuant to a search warrant, even if the reviewing court determines probable cause was absent, if the officers applying for the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate. *United States v. Leon*, 468 U.S. 897, 922 (1984). Under this "good-faith exception," if a law enforcement officer's reliance on a warrant so issued was objectively reasonable, the evidence seized pursuant to the invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* identified four scenarios from *Leon* where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate. *Id.* at 431.

> (1) [W]hen the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* (citing *Leon,* 468 U.S. at 923).

Neither party has identified which of these scenarios may apply in the case at bar. No doubt this is because *Leon* only applies when a warrant is defective. The case at bar is outside the scope of *Leon* because the warrant is in no way defective under any of these

scenarios. Here, Defendant challenges a prior seizure that was not reviewed by a judicial officer.

*Leon* simply does not apply to the conduct complained of; that is, a seizure allegedly made without probable cause and without a warrant. *See generally* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth* Amendment § 1.3(g) (extension of good-faith exception to "without warrant" cases would be ill-advised); *United States v. Real Prop. Located at 15324 Cnty. Hwy. E.,* 332 F.3d 1070, 1076 (7th Cir. 2003) ("We decline to extend further the applicability of the good-faith exception to evidence seized during law enforcement searches conducted in naked reliance upon subsequently overruled case law. . . absent magistrate approval by way of a search warrant."); *United States v. Curzi*, 867 F.2d 36, 44 (1st Cir. 1989) ("The error was attributable solely to the agents—not to some errant judicial officer or imprecise parliament."); *United States v. Whiting*, 781 F.2d 692, 698-99 (9th Cir. 1986) (holding *Leon* did not apply to warrantless border search because *Leon* "is clearly limited to warrants invalidated for lack of probable cause and does not create [a] broad 'good-faith' exception"); *United States. v. Morgan,* 743 F.2d 1158, 1165 (6th Cir. 1984) (refusing to extend *Leon* to a warrantless search that the government argued fell under the "exigent circumstances" exception); *United States v. Maassen*, No. CR07-4066-MWB, 2007 WL 4616285, at *6 (N.D. Iowa Dec. 31, 2007) (gathering cases for proposition that "[s]everal courts have held that *Leon* is inapplicable to warrantless searches"), *R. & R. rejected on other grounds,* 2008 WL 428032 (N.D. Iowa Feb. 14, 2008); *United States v. Boffman*, 747 F. Supp. 1251, 1254 (S.D. Ohio 1990) ("The holding in *Leon* does not modify the exclusionary rule in cases in which the police have acted without a warrant."); *see also Turner v. Taylor*, No. 7:09-CV-02858-JMC, 2011 WL 3794086, at *5 (D.S.C. Aug. 25, 2011) (citing authority that states *Leon* good-faith exception does not apply to warrantless searches and holding that officers were not entitled to summary judgment on

Section 1983 claims because there were issues of material fact remaining in the case). Thus, my recommendation is that, if the Court determines the Kia was seized without probable cause, it should rule that the seizure is not protected by the *Leon* good-faith exception and proceed to determination of whether the evidence is fruit of the poisonous tree.

On the other hand, law enforcement did obtain a search warrant that was supported by probable cause and executed. If I am in error about the existence of probable cause and the applicability of the *Leon* exception, this may nevertheless be a case where law enforcement seized the vehicle without probable cause and executed the warrant with an objective, good-faith belief in the warrant's validity. To the extent the Court determines that a traditional *Leon* analysis is necessary, I conclude law enforcement's reliance on the warrant was reasonable. In determining whether law enforcement's reliance on a warrant was "entirely unreasonable," "[t]he court must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted). *Leon* explained that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted).

If the IFPD officers executing the search of the Kia could not reasonably rely on the search warrant, items seized during the search must be suppressed, even if the seizure was valid. Moreover, a court need not always decide whether a warrant contained probable cause before addressing the good-faith exception. *See United States v. Koons*,

300 F.3d 985, 991 (8th Cir. 2002) ("[B]efore reviewing the existence of probable cause, we may consider the applicability of the good-faith exception to the exclusionary rule.") (quoting *Proell,* 485 F.3d at 430) (ellipses omitted).  I find that officers' reliance on the warrant was reasonable.  Sergeant Wegg not only worked on the warrant affidavit between February 16 and February 27, he also continued investigating the events of both January 3 and February 15.  (Wegg. Hr'g Test.; Def. Ex. E at 9 ¶14; 12-15 ¶¶ 25-35.)  His affidavit contained evidence tying the Kia to the burglary and to suspected drug activity; i.e., the trips to Ottumwa to acquire methamphetamine.  Sergeant Wegg's affidavit describes the January 3 incident, the February 15 burglary, and the February 16 arrest of Defendant and seizure of the Kia.  (Def. Ex. E at 8-11 ¶¶ 11-23.)  The affidavit also describes the information Sergeant Wegg learned after seizing the Kia, including that Defendant told people on the telephone from jail that law enforcement could not search the Kia, he asked people to retrieve the Kia, and that Defendant's father attempted to retrieve the Kia prior to its search.  (*Id.* at 11-15 at ¶¶ 24-35.)  The affidavit contains information explaining Sergeant Wegg's training and experience and the items to be seized.  (*Id.* at 1-8, 15 ¶¶ 1-9, 36-38.)  Defendant does not take issue with this affidavit.

The affidavit states that a search of Ms. Foster's Hyundai after the January 3 incident yielded a black backpack containing methamphetamine and a large amount of cash.  (Def. Ex. E at 9 ¶ 13.)  Firearms seized during that incident were purchased by Ms. Foster.  (*Id.* ¶ 14.)  In addition, Ms. Foster purchased firearms at a pawnshop in Marshalltown and Mr. Riggs showed Ms. Foster and Defendant how to handle the weapons, which ties Defendant to Ms. Foster by more than their relationship.  (*Id.* at 12 ¶ 26.)  The Kia, specifically, is also tied to guns by Mr. Smith's statement that he knew Defendant possessed a .45 caliber firearm and another AR-15 rifle "possibly in Bridges' vehicle."  (*Id.* at 14 ¶ 33.)  Defendant is prohibited from possessing firearms because he is a convicted felon.  Yet, the person Mr. Riggs described as providing the firearm he

24

had with him on January 3 was consistent with Defendant's appearance. Thus, an objectively reasonable officer could conclude that the Kia would contain evidence of the illegal possession of firearms and ammunition.

Moreover, Defendant admitted Ms. Foster was his girlfriend and that they were at the Stewart residence during the burglary on February 15. (*Id.* at 11 ¶ 23.) The Kia was also seen about a mile away from the burglary shortly after the incident and appeared to have been recently driven. (*Id.*; Wegg Hr'g Test.) Mr. Smith believed the burglary was motivated by Defendant's belief that Mr. Smith took methamphetamine from him. (Def. Ex. E at 10 ¶ 18.) In turn, Mr. Smith thought Defendant owed him money for traveling with him in the Kia to Ottumwa on approximately February 1, 2020 to purchase "multiple pounds of methamphetamine." (*Id.*) Finally, as discussed above, Defendant made it clear that he did not want anyone to search the Kia by telling people on "numerous occasions" to attempt to retrieve the vehicle from police custody. (*Id.* at 15 ¶ 35.) Driving to another city to obtain "pounds" of methamphetamine in early February and purchasing double that amount of methamphetamine shortly before the burglary indicates that Defendant was not purchasing drugs for personal use, but rather for distribution. (*Id.* at 10, 14 ¶¶ 18, 30, 32.) Mr. Smith described Defendant as the "main distributor of methamphetamine in Iowa Falls." (*Id.* at 14 ¶ 30.) This information and the known continuing nature of drug distribution also made it likely that the Kia would still contain evidence connected to drug distribution approximately three days after the second trip to Ottumwa. *See United States v. Petruk*, 929 F.3d 952, 960 (8th Cir. 2019) (citing *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995)) (addressing staleness of warrant information and noting that drug trafficking is a crime of a continuing nature). In addition, the connection between drug distribution and guns is well-known, which also makes it reasonable to conclude that firearms would be found in the Kia given the

evidence in the warrant. *See United States v. Ruiz*, 412 F.3d 871, 881 (8th Cir. 2005) ("Firearms are tools of the drug trade due to the dangers inherent in that line of work.").

Based on the thorough history detailed in the warrant, a reasonably well-trained officer would not have thought a search of the Kia was illegal despite the judge's issuance of the warrant. *See Jackson*, 784 F.3d 1231. The warrant showed there was a fair probability that contraband or evidence of a crime would be found in the Kia. *See United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)).

Finally, I note that although Defendant does not argue that the ten-day delay in obtaining the search warrant was a constitutional violation, to the extent an excuse is needed for the delay, Sergeant Wegg has one. He was not only diligently investigating this case and the warrant, but was also working on other matters as they arose for the small IFPD. *Contra Fife*, 356 F. Supp. 3d at 807 (suppressing evidence when it was not even "a close call" that law enforcement "unreasonably delayed obtaining a search warrant for [a] seized hard drive for six months") (distinguishing case from *United States v. Burgard*, 675 F.3d 1029, 1031, 1034-35 (7th Cir. 2012)); *United States v. Bumphus*, 227 A.3d 559, 561, 569-70 (D.C. 2020) (affirming trial court decision that *Leon* good-faith exception did not apply to four-day delay in seeking warrant for vehicle because officers did not act in good faith when they knew vehicle contained driver's child's backpack and wife's purse and cellphone, which they refused to let driver retrieve at the scene of stop, and the court could not "glean even the slightest shred of diligence from [officer's] testimony"). In addition, Defendant's attempts to persuade people to retrieve the Kia from the police indicates that continued seizure was necessary to ensure any evidence was preserved. *See United States v. Beasley,* 688 F.3d 523, 530 (8th Cir. 2012) (probable cause existed to justify temporary seizure of evidence where defendant made "apparent efforts to conceal the property").

Therefore, if the Court concludes *Leon* is applicable, it should also conclude that evidence found in the search of the Kia need not be suppressed. It was objectively reasonable for officers to rely on this warrant when conducting a search of the Kia. I recommend the District Court deny Defendant's motion on this basis.

**C.     Is evidence found in the search of the Kia fruit of the poisonous tree?**

Defendant argues because the seizure of the Kia was illegal, the fruits of the seizure must be suppressed. (Doc. 25-1 at 7.)

"The exclusionary rule 'reaches not only primary evidence obtained as a direct result of an illegal search or seizure . . . but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree.'" *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984) (noting internal marks omitted)) (ellipses in original). However, the evidence must be suppressed only if the "illegality is at least a but-for cause of obtaining the evidence." *United States v. Riesselman*, 646 F.3d 1072, 1079 (8th Cir. 2011).

> In order to determine whether challenged evidence is the fruit of an illegal search or seizure, "the defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence." *United States v. Marasco,* 487 F.3d 543, 547 (8th Cir. 2007). Once the defendant comes forward with specific evidence demonstrating taint, the ultimate burden of persuasion to show the evidence is untainted lies with the government. *Alderman v. United States*, 394 U.S. 165, 183 (1969). In other words, the government must show the evidence obtained after the illegal search was not "come at by exploitation of that illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488.

*Id.*

Here, Defendant has shown a factual nexus between the alleged constitutional violation of the February 16, 2020 seizure of the Kia and the search that yielded

contraband.  However, even if the evidence Defendant seeks to suppress is a product of a seizure unsupported by probable cause, there are exceptions to the fruit of the poisonous tree doctrine such as the independent source doctrine and the inevitable discovery doctrine.  These doctrines are applicable where the evidence would have been acquired by lawful means had the unlawful act not occurred.  *See Nix v. Williams*, 467 U.S. 431, 443-44 (1984) (explaining that neither doctrine puts the prosecution "in a better position than it would have been in if no illegality had transpired").  The independent source doctrine applies if evidence was acquired by lawful means "wholly independent" of the constitutional violation.  *Id.* at 443; *United States v. Reinholz,* 245 F.3d 765, 779 (8th Cir. 2001) ("Under the 'independent source doctrine,' the challenged evidence is admissible if it came from a lawful source independent of the illegal conduct.") (citations omitted). The inevitable discovery doctrine, on the other hand, applies if the evidence would have been acquired by lawful means had the unlawful search not occurred but in fact was not acquired by these lawful means.  *See Murray v. United States*, 487 U.S. 533, 539 (1988) (noting that the inevitable discovery doctrine applied in *Nix* because a lawful search "would have found" the evidence "had [the search] not been aborted" when the evidence was acquired unlawfully, but the independent source doctrine would have applied "if the search had continued and had in fact found" the evidence).

The inevitable discovery doctrine is not applicable.  There is no factual support for the belief law enforcement would have inevitably discovered the evidence in the Kia.  However, there is a factual basis to support application of the independent source doctrine.

It should first be noted that law enforcement did not exploit the allegedly illegal seizure to bolster their warrant application.  There is no evidence, for example, that Sergeant Wegg peeked in the Kia's trunk and used what he saw there to bolster the affidavit.  Instead, while the Kia was impounded, Sergeant Wegg and others continued

28

their investigation and drafted the affidavit containing information from multiple sources, none of which depended on information from any illegal seizure – let alone search – of the Kia. The seizure may have deprived Defendant of the opportunity to spoliate evidence contained in the vehicle, but Defendant had no right to do so. *See United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012) (finding that temporary seizure of the defendant's computers to avoid destruction of evidence while officers applied for a search warrant did not meaningfully interfere with defendant's possessory interests because he was in jail and could not access computers); *United States v. Goodale*, No. 12-CR-3011-LRR, 2012 WL 1965600, at *6 (N.D. Iowa May 31, 2012) (officers had right to seize laptop prior to obtaining search warrant to prevent defendant from destroying evidence) (citing *Clutter*, 674 F.3d at 985), *aff'd*, 738 F.3d 917 (8th Cir. 2013); *see also United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015) ("Where individuals are incarcerated and cannot make use of seized property, their possessory interest in that property is reduced.") (citing *Segura v. United States*, 468 U.S. 796, 813 (1984) (Burger, C.J.) (plurality opinion) (holding that defendants' possessory interests in their apartment were "virtually nonexistent" when they "were under arrest and in the custody of the police throughout the entire period the agents occupied the apartment")).

Although Defendant's arrest was the but-for cause of Sergeant Wegg learning that Mr. Riggs was at the Stewart residence during the burglary because Defendant told Sergeant Wegg this information during his post-arrest interview, and this likely led to the subsequent interview of Mr. Riggs (Def. Ex. E at 11-13 ¶¶ 24-27), that had nothing to do with the seizure of the Kia. Defendant only challenges the seizure of the Kia, not his arrest and statements made during his subsequent interview. (Def. Ex. A.) In addition, Ms. Stewart, the victim of the February 15 burglary, also admitted to Agent Strouse in a follow-up interview that Mr. Riggs was at her residence during the burglary. (Def. Ex. E at 13 ¶ 28.) Ms. Stewart had originally withheld this information because she thought

Mr. Riggs had an outstanding warrant, she knew he was homeless, and she did not want to get him into trouble. (*Id.*) Thus, I concluded that the independent source doctrine applies and, therefore, the items seized should not be excluded as fruit of the allegedly unlawful seizure of the vehicle.

I recommend the District Court deny Defendant's motion on this basis.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **DENY** Defendant's Motion to Suppress. **(Doc. 25.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 1st day of April, 2021.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa