# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> MATTHEW SHAWN VICTOR BRIDGES, <br><br> Defendant. | No. 20-CR-108-CJW-MAR <br><br> **ORDER** |

## I. INTRODUCTION

This matter is before the Court on defendant's Objections (Doc. 61) to the Report and Recommendation (Doc. 36) of the Honorable Mark A. Roberts, United States Magistrate Judge. On January 29, 2021, defendant filed a Motion to Suppress. (Doc. 25). The government timely filed a resistance. (Doc. 29). On February 24, 2021, Judge Roberts held a hearing on the motion and requested supplemental briefing from the parties. (*See* Doc. 33). On April 1, 2021, Judge Roberts issued his Report and Recommendation ("R&R"), which recommends that the Court deny the Motion to Suppress. (Doc. 36). On April 22, 2021, defendant timely filed his objections to the R&R. (Doc. 61).

For the following reasons, the Court **overrules** defendant's objections, **adopts** Judge Roberts' R&R, and **denies** defendant's Motion to Suppress.

## II. STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those
> portions of the report or specified proposed findings or recommendations

to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

See also FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id*. If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is


limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full de novo review" if the record is concise. *Id*. Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the

Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

## III. FACTUAL BACKGROUND

A number of the points raised by defendant are not so much objections as they are clarifications or reiterations of key facts found by Judge Roberts. (Doc. 61, at 1–4). Defendant presumably highlights these facts as foundational elements of his objections to Judge Roberts' legal conclusions and are noted by the Court accordingly. (*Id.*, at 4–7). After reviewing the record, the Court finds that Judge Roberts accurately and thoroughly summarized the relevant facts in his R&R. (Doc. 36, at 3–13). The R&R and the parties' briefs all contain substantially more factual detail than is necessary to decide the narrow issue now before the Court. For the sake of simplicity in what is admittedly a factually convoluted case, the Court will include here only those facts which are pertinent to the legality of the seizure of defendant's vehicle and will omit those facts which occurred afterwards.

In the early morning hours of January 3, 2020, the Iowa Falls Police Department ("IFPD") received a report of "suspicious males" near the Agri-Pro warehouse in Iowa Falls, Iowa. IFPD Sergeant Erhardt and Officer Krieger responded to the call. Upon arriving, the officers observed an undetermined number of people flee in an SUV and an adult male—later identified as Steven Riggs ("Riggs")—exit a black Hyundai Elantra and flee on foot. The Hyundai was still running and both doors on the driver's side were left open.

Officer Krieger pursued the SUV and Sergeant Erhardt pursued Riggs a short distance. After Riggs refused to comply with commands to stop, Sergeant Erhardt subdued him with his police-issued taser. Once apprehended, Sergeant Erhardt discovered a .22 caliber AR-style rifle tucked inside Riggs' coat. Upon hearing of the presence of firearms, Officers Krieger suspended pursuit of the SUV and returned to the scene to assist Sergeant Erhardt. The identities of the occupants of the SUV were not ascertained.

Back at the scene, Sergeant Erhardt located two more rifles identical to the one found on Riggs. When questioned about the rifle, Riggs stated that he obtained it from a black or Hispanic male with dark, curly hair. The Hyundai was registered to one Nyjaya Foster ("Foster"). Sergeant Erhardt knew Foster to be defendant's girlfriend. Officers arrested Riggs and seized the Hyundai, transporting it to the IFPD secured lot to await the issuance of a warrant to search it.

The next day, January 4, 2020, after obtaining a search warrant, IFPD officers searched the Hyundai. Inside the vehicle, Sergeant Erhardt discovered a collapsible police baton commonly referred to as an asp, a taser, a police scanner, and drug paraphernalia. He also found .22 caliber ammunition and ammunition magazines matching the rifles discovered the previous morning. Located inside a black backpack, Sergeant Erhardt found approximately $6,000[1] in cash and approximately one kilogram of a white crystalline substance which he believed to be methamphetamine. After completing the search, Sergeant Erhardt learned that Foster had reported the Hyundai as stolen at 9:18 PM the previous evening, several hours after police had seized it.

On January 5, 2020, Sergeant Erhardt conducted a criminal background check on defendant and discovered that defendant had previously been convicted for burglary in the third degree, use of a juvenile to commit a forcible felony, conspiracy to commit robbery, and carrying weapons, as well as several misdemeanor drug possession convictions.

On January 10, 2020, defendant appeared at the IFPD and attempted to secure the release of the Hyundai. After being denied release of the vehicle itself, defendant attempted to secure release of the money found in the Hyundai. IFPD denied this request

---

[1] The record is unclear as to the precise amount of cash found in the Hyundai but it appears to have been somewhere between $5,000 and $6,000. In the context of the issues to be addressed by the Court here, the exact amount is immaterial.

as well. That same day, IFPD Sergeant Daniel Wegg came into contact with defendant during an unrelated traffic stop. Sergeant Wegg recognized defendant from previous encounters and knew that defendant also drove a purple Kia Optima. On February 5, 2020, Foster attempted to claim the money found in the Hyundai. During their efforts to recover the money, neither defendant nor Foster mentioned the firearms, ammunition, magazines, drugs, or drug paraphernalia discovered in the vehicle. Due to his close association with Foster and his interactions with officers regarding the money, IFPD officers considered defendant a person of interest in the investigation of the rifles and drugs that were seized.

At 9:18 PM on February 15, 2020, Sergeants Wegg and Erhardt were dispatched to 1210 Ellis Avenue in Iowa Falls—the home of Martika Stewart ("Stewart")—in response to a reported burglary involving a firearm. As the officers neared the residence, Sergeant Wegg observed two adult females walking north on Moorhead Avenue and recognized one of them as Foster. Upon arriving at Stewart's residence, Sergeant Wegg secured the perimeter and the officers made contact with Stewart and one Will Smith ("Smith"), Stewart's live-in boyfriend. Neither officer observed signs of forced entry. Smith was holding his right arm and a black revolver was sitting on the kitchen counter. Sgt Erhardt rendered the revolver safe and found two spent shell casings in the cylinder. Sergeant Wegg then interviewed Smith. Smith stated that while he and Stewart were alone in the home, a male and two females entered the house without permission and assaulted him. Smith identified defendant as the male assailant, using both defendant's given name and his nickname—Mocha. Smith identified one of the female assailants as Foster—defendant's girlfriend—but was unable to identify the second female assailant. Smith did not report the presence of anyone else in the home.

According to Smith, defendant entered the home and demanded "his shit" from Smith. After Smith denied knowledge or possession of defendant's as yet unidentified

7

property, defendant struck Smith with an asp. Smith attempted to shield himself from the blow, resulting in a wound to his forearm. A scuffle ensued between Smith, defendant, and the two female assailants. During the fight, defendant ordered the unidentified female to produce a firearm. The woman retrieved the black revolver from her sweater pocket and attempted to give it to defendant. Smith managed to wrestle the revolver away from the woman and defendant and fired a round into the wall. This caused a brief pause in the melee which the two female assailants did not rejoin. When defendant attempted to reengage Smith, however, Smith fired another round at defendant who then fled the home. Smith demanded that Foster and the unidentified female leave the residence and the pair left the home together headed west. Police recovered the asp baton used by defendant to assault Smith at the scene.

IFPD officers knew that defendant's mother lived on Hickory Street in Iowa Falls, so they attempted to locate defendant there. At approximately 9:50 PM, IFPD Officer Krieger observed defendant's purple Kia Optima in the 600 block of Hickory Street. Officers knew that defendant drove the purple Kia because of their prior interactions with him and because he was a person of interest in the investigation of the January 3 incident. The distance from the site of the burglary to where defendant's vehicle was discovered is approximately one mile. Sergeant Wegg arrived to investigate and observed that the Kia did not have frost on the windshield. Based on this observation, Sergeant Wegg surmised that the vehicle had been operated recently. The officers attempted to locate defendant but were unsuccessful.

The next day, February 16, 2020, Sergeant Wegg applied for arrest warrants for both defendant and Foster. At approximately 4:30 PM that same day, Sergeant Wegg was patrolling eastbound on Ellis Avenue when he observed defendant driving westbound on Ellis Avenue in his Kia. Sergeant Wegg turned around and began to follow defendant but was unsure of whether he could arrest defendant because the arrest warrant had not

8

Case 1:20-cr-00108-CJW-MAR    Document 65    Filed 05/10/21    Page 8 of 19

yet been issued. At the same time, Sergeant Wegg observed Foster walking on Ellis Avenue near to where the assault had taken place the night before. Sergeant Wegg radioed IFPD Officer Knudsen, the other officer on duty, for assistance. After consulting with the county attorney by phone, Sergeant Wegg initiated a felony stop to arrest defendant. Defendant pulled into a parking lot and parked legally.

As defendant's vehicle came to a stop, a previously undetected passenger exited the vehicle from the rear passenger door. Sergeant Wegg identified the passenger as Adam Schmitz ("Schmitz") and ordered Schmitz to depart the scene. Sergeant Wegg then arrested defendant based on his alleged involvement in the assault of the previous evening. Sergeant Wegg advised defendant of his rights and secured defendant in the backseat of his patrol car. Sergeant Wegg also seized defendant's cell phone and his vehicle due to the possibility that other firearms, contraband, or other evidence may be located in those items.

While still at the scene of his arrest, defendant admitted to being at the Stewart residence the night before with Foster and another woman, but denied breaking into the residence. Defendant stated that he was let inside the residence and denied bringing weapons or getting into a fight with Smith. Defendant was then transported to the Hardin County Jail.

While at the jail that same day, defendant requested to speak with Sergeant Wegg. Sergeant Wegg reminded defendant of his rights and asked if defendant still wanted to speak to him. Defendant stated that he still wanted to speak to Sergeant Wegg and again admitted to being present at the Stewart residence the night before. Defendant stated that he had been invited there by Schmitz and was let into the residence by Riggs. Defendant continued to deny any knowledge of an assault or weapons.

Based on the information provided by defendant, Sergeant Wegg decided to call in Stewart and Smith for further questioning. Smith and Stewart appeared for further

9

questioning that day and confirmed that Riggs was at the residence on the night of the assault.

## IV. ANALYSIS

The facts described above are the facts as they were known to Sergeant Wegg and other IFPD officers at the time they seized defendant's vehicle or immediately thereafter. During the subsequent investigation, many more details arose that clarify or support the seizure, but these facts are not helpful in answering the question now before the Court—namely, whether the warrantless seizure of defendant's vehicle on February 16, 2020, violated the Fourth Amendment.

The Fourth Amendment protects people from unreasonable seizures of their person or property. *See* U.S. CONST. amend. IV. Warrantless seizures are presumptively unreasonable and therefore precluded by the Fourth Amendment, subject to a handful of "jealously and carefully drawn" exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)).

One such exception is the so-called automobile exception. This long-standing exception to the warrant requirement allows law enforcement officers to search an automobile based on probable cause alone—that is to say, without a warrant—so long as the vehicle is inherently mobile or regulated as a motor vehicle. *See United States v. Maccani*, 20-CR-90-CJW-MAR, 2021 WL 943109, at *16–20 (N.D. Iowa Mar. 12, 2021) (describing the development and requirements of the exception and collecting cases). This does not mean, however, that law enforcement officers must exercise the automobile exception when they have the opportunity to do so. Indeed, none of the relevant cases

> require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords. But the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover,

10

> the opportunity to search is fleeting since a car is readily movable. Where this is true, as in *Carroll* and the case before us now, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search.

*Chambers v. Maroney*, 399 U.S. 42, 50 (1970). As the Supreme Court noted in *Chambers*, the relevant requirements of the automobile exception that justify a search on the roadside—probable cause to believe evidence will be discovered in the vehicle and the ready mobility of the vehicle—continue to obtain at the station house. *Id.*, at 52. Officers may therefore either search the automobile immediately or seize the vehicle until they obtain a warrant to search the automobile, depending on the circumstances and at their discretion, so long as they have probable cause to do so. *See United States v. Sims*, 424 F.3d 691, 693 (8th Cir. 2005) ("[A]n automobile may be seized without a warrant under the 'automobile exception' to the warrant requirement" when officers have probable cause to do so.).

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003). "The probable cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal citations and quotations omitted). "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *United States v. Winarseke*, 715 F.3d 1056, 1067 (8th Cir. 2013). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Brinegar v. United States*, 338 U.S. 160, 176 (1948) (internal citations and quotations omitted).

11

### A. *Probable Cause at the Time of the Seizure*

Judge Roberts found that Sergeant Wegg possessed ample information to support the warrantless seizure of defendant's vehicle on February 16, 2020. (Doc. 36, at 16–20). In his objections, defendant essentially disputes the weight Judge Roberts gives to numerous factual findings and argues that they do not amount to probable cause. (Doc. 61, at 1–4). Defendant specifically objects to Judge Roberts' finding that Sergeant Wegg had probable cause to believe that "blood or other forensic evidence" would be found in the Kia and that it was used as a "getaway car." (*Id.*, at 4). Defendant also objects to the broader finding that Sergeant Wegg had probable cause to believe evidence of the February 15, 2020 incident would be found in the Kia. (*Id.*).

Sergeant Wegg was privy to ample information supporting probable cause to believe that defendant used the Kia in relation to the burglary and assault on Smith and that there was a fair probability that evidence of those crimes would be located within the vehicle. There is some dispute about whether a burglary actually occurred, whether defendant "broke into" the Stewart residence, or whether he was invited in. The absence of physical evidence supporting a "break in"—one imagines shattered door jambs or drilled-out locksets—does not preclude the possibility of other forms of unwelcome entry. Defendant could have knocked, for example, and then forced his way into the home when the resident opened the door. Alternatively, defendant may have picked a lock using a non-destructive but equally unwelcome mechanism of entry. Or, more simply, defendant may have just walked through an unlocked door without permission.

Whether any of these possible scenarios satisfy an element of the legal definition of burglary is immaterial because Sergeant Wegg was investigating not merely a burglary, but the allegation that defendant unlawfully entered the Stewart residence where a fight occurred which resulted in the discharge of a firearm. Smith identified defendant by name as his assailant in the attack which occurred less than 24 hours prior to the seizure.

12

Sergeant Wegg knew that defendant had used an asp baton in the attack and that Smith had been injured. Sergeant Wegg also knew that Smith had fired two rounds from the revolver. At the time of the seizure, none of the rounds had been recovered from the Stewart residence. It is therefore entirely plausible for Sergeant Wegg to have suspected that defendant was struck by one of the rounds. In light of the close physical struggle between the parties, the wound sustained by Smith, and the possible wound sustained by defendant, a belief in the fair probability of finding physical evidence in the form of blood, tissue, hair, or other such material—from any of the parties involved—was reasonable.

Given the circumstances of the altercation, there was a fair probability such evidence would have been located in the Stewart residence, along defendant's egress route, inside defendant's vehicle if he used a vehicle to escape, at the safe house to which defendant fled, and at defendant's home. Further, such evidence may have been found by itself—as a blood stain on upholstery, for example—or it may be on clothing, bandages, or other items that are subsequently discarded or hidden—under a seat or in the trunk of a car, for example. Nothing that Sergeant Wegg knew at the time of the seizure ruled out any of these possibilities. As Judge Roberts succinctly stated, "[a] vehicle, if tied to the [incident] temporally, geographically, and circumstantially . . . could reasonably be expected to contain additional" evidence of the alleged criminal conduct. (Doc. 36, at 17).

Defendant denies that Sergeant Wegg had probable cause to believe that defendant's vehicle was involved or otherwise linked to the assault, however, rendering any belief that evidence would be found in the vehicle unreasonable. (Doc. 61, at 4). The Court disagrees. Neither Smith nor Stewart knew where defendant ran when he retreated from the residence the night of February 15, 2020. IFPD officers also failed to locate defendant that night. They did locate his car, however, approximately one mile

13

away near his mother's residence, and they had reason to believe that it had recently been driven. Defendant argued that the officer's observation that the car did not have frost on the windshield is not enough to determine when the vehicle was last driven. (Docs. 25-1, at 6; 61, at 3). This observation is of course imprecise and not alone dispositive of anything. Taken together with everything else known to officers at that time, however, it does tend to support the conclusion that defendant's Kia was used to transport the assailants to the Stewart residence and, subsequently, to spirit defendant away from the scene.

Officers knew that defendant's mother lived on Hickory Street in Iowa Falls and that defendant lived approximately 60 miles away from Iowa Falls in Mason City. Based on the events surrounding the January 3, 2020 incident officers also knew that Foster had her own vehicle, the black Hyundai. Sergeant Wegg observed Foster and another woman walking away from the Stewart residence the night of the assault. It is somewhat irregular for a person who has their own vehicle to elect to walk after dark during a cold February in Iowa. Further, based on his interview with Smith, Sergeant Wegg knew that defendant and Foster had been together immediately prior to the assault and left the house within moments of one another. The fact that Sergeant Wegg did not see defendant walking with Foster—indeed, did not see him at all—supports the conclusion that they arrived together by vehicle but defendant took the vehicle himself when he left in haste. The innocuous explanation for the presence of defendant's vehicle dozens of miles from his home in the middle of the night—that he was visiting his mother—is somewhat undercut by the fact that defendant's vehicle vanished from its location on Hickory Street by 12:30 AM that same night. Ultimately, officers were under no obligation to rule out that possibility to establish probable cause. *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983) (noting that because "probable cause requires only a probability . . . of criminal activity,

14

not an actual showing of such activity . . . innocent behavior frequently will provide the basis for a showing of probable cause.").

If these facts were all that Sergeant Wegg knew prior to seizing the Kia, the Court would still find that probable cause existed supporting the seizure. Sergeant Wegg had substantially more information, however. His assessment of the Kia's involvement was not constrained to defendant's activity on February 15 and 16, but rather drew on the sum of his knowledge of defendant, including the events surrounding the January 3 incident. Sergeant Wegg knew that a person generally matching defendant's description[2] who was associated with defendant's girlfriend, Foster, had given Riggs a rifle the night of January 3. Based on admissions made by defendant which were roughly contemporaneous with his arrest, defendant and Riggs knew one another, placing defendant in closer circumstantial proximity to the January 3 incident. Based on the search of the Hyundai, Sergeant Wegg knew that whoever was in the Hyundai that night may also be involved in the distribution of methamphetamine. Based on the attempts of both defendant and Foster to secure the money seized from the Hyundai—taken with the fact that the money was found in the same backpack as the methamphetamine—Sergeant Wegg could reasonably infer that defendant knew of the methamphetamine as well. All of this reasonably supports the conclusion that defendant was involved in firearms and methamphetamine distribution to some degree. Finally, the other weapons recovered

---

[2] Defendant argues that the descriptor "Hispanic" refers to people who speak Spanish and "therefore, because the Defendant does not speak Spanish, he does not match the description." (Doc. 61, at 3). The Court disagrees slightly in that the term Hispanic—while technically referring to things from or related to Spain when used as an adjective—is also commonly used as a noun to refer to Spanish-speaking people, "especially [those] of Latin-American descent, living in the U.S." *Hispanic*, OXFORD ENGLISH DICTIONARY (May 6, 2021) https://www.oed.com/view/Entry/87253?redirectedFrom=hispanic&. Given the imprecision with which Americans tend to use racial and ethnic descriptors, defendant's narrow interpretation of the term does not align with common usage.

from the Hyundai—an asp and a taser—comport with the *modus operandi* of Smith's assailant on February 15. These types of weapons are sufficiently uncommon enough amongst criminals to support a connection between the individuals present at the January 3 incident and defendant's conduct on February 15.

The Court concludes that Sergeant Wegg possessed probable cause to believe that evidence of a crime would be discovered in defendant's vehicle when he seized the Kia on February 16, 2020. That Sergeant Wegg did not immediately observe evidence in plain sight is of no moment. Given the breadth of Sergeant Wegg's knowledge of defendant's recent activity, evidence may have been as small and easily concealable as a taser, an asp, or even blood from defendant's wound. Such evidence may have been located anywhere in the vehicle, to include in areas not readily visible to the public. Defendant's objection on this ground is **overruled**.

### B. Length of Seizure of Defendant's Vehicle

Defendant argues that the prolonged seizure of his vehicle while law enforcement conducted subsequent investigation was unlawful. (Doc. 61, at 4). "[I]n no case has this Court held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period." *Illinois v. McArthur*, 531 U.S. 326, 334 (2001). In such cases, courts must "balance the privacy-related and law enforcement-related concerns to determine if the intrusion is reasonable." *Id.*, at 331. In light of the competing concerns at issue here, the Court finds that the intrusion was reasonable.

First, defendant was in custody at the Hardin County Jail for the entire period of the seizure prior to the warrant being executed. Thus, his possessory interest in the Kia could not have been realized even if the IFPD had released the vehicle. The only other person who could plausibly have made a claim to the Kia was defendant's father, the registered owner of the vehicle. It seems that the Kia was, for all intents and purposes,

16

defendant's vehicle, however. Whatever legal interest defendant's father may have had in the Kia notwithstanding, his privacy interest in the vehicle was minimal.

Second, the interest of law enforcement in preserving potential evidence was high. Faced with a violent crime involving a firearm and a potential link between the assault of February 15 and the firearms and drugs discovered in connection with the January 3 incident, the IFPD had an overriding interest in preventing the dissipation of evidence in the Kia. This interest became more heightened with every passing day. Even as Sergeant Wegg pursued a search warrant, further investigation revealed steadily more evidence connecting defendant to suspected crimes. Most notably, defendant made calls to numerous people while in custody urging them to retrieve the Kia and to not allow the police to search it. Releasing the Kia prior to a search would almost certainly have resulted in the destruction of evidence. The Court finds that the continued seizure of the Kia until a search warrant was obtained to be reasonable given the weight of the interests involved.

Further, the Court finds that the lapse of ten days from the time of seizure to execution of the search warrant reflects not a lack of diligence on behalf of the IFPD, but rather a lack of manpower. The IFPD is a small department and is unable to devote an officer such as Sergeant Wegg to a single investigation. Sergeant Wegg had to balance his duties as a patrol officer with his investigation of defendant's activities. This resulted in a delay between the seizure of the Kia and the execution of the search warrant, but not one which was unreasonable under the circumstances. Defendant's objection on this ground is **overruled.**

### C. *Independent Source Doctrine*

Judge Roberts alternatively found that even if the Court finds the seizure of defendant's Kia to be unsupported by probable cause, the evidence discovered in the vehicle should not be suppressed because none of the information used to secure the

17

warrant came to light as a result of the seizure of the Kia. (Doc. 36. At 28–30). Defendant objects to this finding and argues that the independent source doctrine cannot apply because the seized vehicle was kept in law enforcement's possession. (Doc. 61, at 5).

The independent source doctrine does not apply where law enforcement's "decision to seek the warrant was prompted by [a Fourth Amendment violation] or if information obtained [by that violation] was presented to the Magistrate and affected his decision to issue the warrant." *Murray v. United States*, 487 U.S. 533, 542 (1988). The Court agrees with Judge Roberts on this score. The investigation against defendant was undoubtedly advanced by his arrest and statements he made to officers. None of the evidence discovered subsequent to his arrest or anything that ended up in the application for the search warrant was discovered as a result of the seizure of the Kia, however. So far as the Court can tell, the Kia simply sat in the IFPD secured lot for ten days while Sergeant Wegg prepared the search warrant application. In other words, the seizure of the Kia, assuming it was unlawful, provided no advantage to officers in the course of their investigation.

The question is ultimately moot because the Court has found that Sergeant Wegg had probable cause justifying the seizure of the Kia, but even if probable cause was lacking, the evidence derived from the search warrant should not be suppressed because it was derived from a source independent of the constitutional violation. Defendant's objection on this ground is **overruled**.

## V. CONCLUSION

For the reasons stated above, defendant's objections are **overruled**. (Doc. 61). The Court **adopts** Judge Roberts' Report and Recommendation (Doc. 36) and **denies** defendant's Motion to Suppress (Doc. 25).

**IT IS SO ORDERED** this 10th day of May, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa